[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the judicial district of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff and the defendant, whose maiden name is Jean Mead and whose last married name was Jean Albert, were married on July 2, 1988, in Danbury, Connecticut. The plaintiff has resided continuously in the state of Connecticut for at least twelve months immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are no minor children issue of the marriage and no minor children have been born to the defendant wife since the date of marriage of the parties. Neither party has received state assistance.
The court finds that each party is equally at fault for the breakdown of the marriage. The parties separated in 1994. CT Page 11643
The plaintiff is a police officer with the city of Danbury police department. He has been a police officer since 1967. When the parties married, the plaintiff had several bank accounts that he intended to use for college for his children from a prior marriage. He also owned his home at 24 Mountain Road, Danbury, Connecticut. He owned an automobile. He also had some bank accounts. The plaintiff was a lieutenant with the Danbury police force when the parties married, which is his same position at this time. He now has been a police officer for thirty years. In addition, he is a vice president in the police union for which he receives additional compensation. The plaintiff has high blood pressure, otherwise he is in good health. The plaintiff was born on April 19, 1946. The plaintiff has a high school education and two years of college. The plaintiff's daughter is twenty-four years old and his son is twenty-six years old.
The plaintiff's financial affidavit, filed when this trial started, shows that he owns stocks and bonds with a total value of $70,000 and that he had a one-half interest in them. Those were the accounts that he claims were set up for his children from a prior marriage for college expenses. A revised affidavit filed by the plaintiff dated October 8, 1997, corrected the value of those stocks and bonds to show a current value of $130,713.04 and that he has no interest in them. Those accounts consist of the following:
Stocks, Bonds, Mutual Funds
American $ 7,185.20
Benham Equity $ 3,167.61
Benham Income $ 5,648.51
Janus $27,288.51
Montgomery $ 6,057.78
Nicholas $19,125.52
Price $15,549.51
Penn Mutual $16,920.91
Fidelity $13,500.69 CT Page 11644
Vanguard $16,268.80
TOTAL $130,713.04
There is no credible evidence as to the value of the stocks or bonds as of the date the parties married. The Vanguard stock account in the amount of $16,268.80 is in the plaintiff's name and his daughter's name. The T. Roe Price account is in the plaintiff's name only. The Royce account, also known as Penn Mutual, as well as the Janus account are both in the plaintiff's name and that of his son. The plaintiff's financial affidavit shows one of his stock funds to be an American Fund. That is the same as New Prospective Fund. The American Fund, the Montgomery Fund, and the Fidelity Fund are all in the plaintiff's name only. No credible evidence was presented regarding whether the two Benham Funds, as well as the Nicholas Fund, were in the name of anyone other than the plaintiff alone. The Nutmeg Federal certificate of deposit in the amount of $40,236.53 is in the plaintiff's name and that of his son.
The court finds that all stocks shown on the plaintiff's financial affidavit are either in his name only or are in his name and that of either his son or daughter. The court is including as property of the plaintiff all of those shares of stock in determining all financial orders, as well as the Nutmeg certificate of deposit.
The parties purchased property in Arnell Creed, Sussex County, Delaware on August 6, 1988, for $30,900. From the evidence presented, the court finds that its present fair market value is $27,000. The parties initially took out a fifteen year mortgage to help finance the purchase of the property. That mortgage was paid off in 1994. The title to the property is in the name of the plaintiff and the defendant. It is undeveloped land in a housing development that is approximately 75 percent developed.
The plaintiff's base pay was $53,820 prior to a new collective bargaining contract being negotiated. That new contract was signed on September 30, 1997, and included a 2.75 percent salary increase retroactive to July 1, 1997. As a result of that increase, his base pay was increased to $55,300. His gross weekly income as a police lieutenant is $1249.50. In determining his net weekly income, the court is eliminating his CT Page 11645 credit union expense of $25 weekly and his union dues of $6.46 weekly. In addition, he has gross weekly income of $34 and net weekly income of $29 as a result of being an officer in the police union. He also has gross weekly income of $208 and net weekly income of $162 from interest and dividends. His financial affidavit shows a deduction for social security for $41.40. That is actually his pension plan contribution.
In the calendar year 1996, the plaintiff's gross wages from his base pay, as well as extra income that he receives for working overtime, uniform income, holiday pay, outside pay and court time was $66,773.90.
On April 8, 1997, the plaintiff had $4468 in his Danbury Federal Credit Union account. That account is now reduced to approximately $1300 as a result of a $5000 down payment he made on a motor vehicle. He also has a checking account at Fleet Bank with a balance of $1700 in his name only. He also has an account at Pawling Savings with a balance of $501.48. He purchased his 1996 Dodge in December of 1996, for $18,026.12. He financed it through a $10,242 loan. Its present fair market value is $16,000 and its loan balance is $11,000, with an equity of $5000. In the spring of 1997, he gave $3000 to his son for a motor vehicle. Approximately, in September of 1997, he gave a $1000 to his daughter and gave $800 to his ex-wife. He shows, as a liability, a debt to Suncoast Schools Federal Credit Union in the amount of $51,000. He cosigned on a mortgage with his ex-wife for a Florida home, in the name of his ex-wife only, after the defendant vacated the family residence. He has a Prudential life insurance policy in the face amount of $5000 and a second in the face amount of $10,000. His children from his prior marriage are the beneficiaries of each of those policies. He also has a life insurance policy in the face amount of $50,000 through his employment with the city of Danbury. The defendant is probably the beneficiary of that policy. The plaintiff's financial affidavit shows his pension fund as an asset with a value of $29,391.95. That is the amount of his contribution to the pension plan and does not represent the present value of the pension plan.
In September of 1997, he was paid for thirteen unused sick days which amounted to six and one-half days pay. He presently has two hundred sick days accumulated. The sick days that he has accumulated cannot be converted to cash but can be used in the event he is out ill. CT Page 11646
When the parties married, the defendant was employed at the Holiday Diner in Danbury, Connecticut working three days a week, an average of approximately twenty hours per week. She still has the same work schedule working Monday, Tuesday and Wednesdays. The defendant, in her claims for relief, seeks to have certain items returned to her as itemized on Schedule A. Items ten and eleven on that list do not exist. The plaintiff agrees that the defendant can have item number five. Item number twelve may not exist. He has the balance of those items. He does have two brass lamps and agrees she can have one. The cost of COBRA benefits for the defendant is $270.04 for health insurance and $19.88 monthly for dental insurance, and is available for thirty-six months. When the parties married, the defendant had approximately $3000 in cash. The defendant is fifty-eight years old. She also owned an automobile and furniture. The defendant had back surgery in 1980. She also has glaucoma. She takes eye drops two times a day and sees a doctor three times a year for her glaucoma. She also has thyroid problems.
During the period of time the parties were married, the defendant received two separate inheritances. The defendant's mother died in approximately 1990. The defendant inherited approximately $30,000 from her mother's estate which she deposited into a bank account and allowed the interest to accumulate. It is shown on her financial affidavit as a certificate of deposit at Village Bank. When her uncle died, she received through his estate a motor vehicle, $13,500, his ring and his life insurance. Prior to the date her uncle died, he gave her his Belfast, Maine home. The home was sold for $55,000 and the funds were used by the defendant to buy a mobile home in 1991. Her uncle lived in a mobile home until he died. The court finds that the fair market value of that mobile home is $48,000 and that it does not have a mortgage. The defendant's uncle gave her a vehicle prior to his death. That vehicle was sold by the defendant for $4000 and the proceeds were used to maintain the vacant mobile home lot for approximately one year. The insurance that she received after her uncle died on March 28, 1992, was $3500. The $30,000 that she received from her mother's estate and the $13,500 that she received from her uncle's estate were both placed into her Village Bank account. She also received forty-five shares of Raytheon stock when her uncle died. That stock is now split and she now owns ninety shares of stock. Its fair market value is $5310. CT Page 11647
When the parties married, the defendant also had a pending worker's compensation claim for which she received $5000 shortly after their marriage.
The defendant's financial affidavit shows the correct cost for her to have COBRA benefits under the plaintiff's health plan. The defendant owns a mobile home with a fair market value of $48,000. The defendant's financial affidavit shows a liability to Marge Benz in the amount of $4200. That liability does not exist.
The defendant is entitled to receive social security benefits. She would receive $400 monthly at age sixty-five, $410 monthly at age sixty-five and four months, and $545 monthly at age seventy.
The plaintiff's pension with the city of Danbury will pay him 2 percent of his base pay times the number of years that he is a police officer to a maximum of 68 percent. His monthly accrued benefit as of October 1, 1997, is $2766.05. He has thirty-four years of service as of October 1, 1997. He is currently eligible to retire. If he were to retire at the present time, the present value of his pension plan would be $605,846. If he were to retire at age 55, the present value of his pension plan would be $449,290. If he were to retire at age 60, the present value of his pension plan would be $286,138. If he were to retire at age 65, the present value of his pension plan would be $173,625. The parties are in dispute as to which method the court should elect in distributing the plaintiff's pension. The defendant seeks to have the court elect the present value or offset method. The plaintiff seeks to have the court elect the present division method. Under the present division method, the court determines, at the time of trial, the percentage share of the pension benefits to which the nonemployee spouse is entitled and declares that, upon maturity, a fixed percentage of the pension be distributed to each spouse. The court, in the exercise of its discretion, is electing the present division method. The base pay is the highest of any one year base pay. The plaintiff does not have any present intention to retire. When he retires, he will not receive any social security benefits as he did not pay into social security. The plaintiff's base pay includes his sick pay, holiday pay and uniform allowance pay. He accumulates fifteen days annually for sick leave and can elect to receive 50 percent of any sick leave that he does not take. His uniform pay is due and payable as of July 1, of each year and his holiday pay is paid on November 1, of each year. He also receives longevity pay. CT Page 11648 He also receives an annual $600 educational pay allowance that is part of his W2. The longevity pay for anyone who has twenty years or more of service is $800 annually. It is payable on the first day of October. The plaintiff received his longevity pay on October 3, 1997.
The pension board for the police pension meets monthly on the first Tuesday of each month. On occasion it calls special meetings. Section 14-60 of the pension plan provides as follows:
 BENEFITS DECLARED TAX-EXEMPT, UNASSIGNABLE, NOT SUBJECT TO PROCESS. The right of any person to a pension or to the return of contributions, or to any benefit or right accrued or accruing to any person under the provisions of this Article and the cash and securities held under the provisions of this Article shall be exempt from any state or municipal tax and from levy, sale, garnishment, attachment or any other process, and shall be unassignable.
There are no survivorship benefits under this plan for a divorced wife. There was evidence presented at the trial that the pension board for the city of Danbury for police pension funds will not follow a court order dividing this pension plan as a part of a dissolution of marriage. This is apparently as a result of advice of counsel.
A number of cases have addressed the issue of language that is similar to § 14-60 either as a result of state statute or as a result of pension plan language. In Rice v. Rice,762 P.2d 925, 926-27 (Okla. 1988), the court stated in part as follows:
 The question is whether pension benefits payable under the Oklahoma Police Pension and Retirement System are excluded from consideration as jointly acquired property pursuant to 11 O.S. 1981, § 50-124.[1] We hold that, under the facts of this case, the district court was correct when it considered the appellant's police pension as jointly acquired property.
* * *
The title of the provision now at issue, CT Page 11649 "Exemption of System Funds from Legal Process — Assignment Prohibited," construed with the language of the statute as a whole, convinces us that the enactment was created as a form of "spendthrift" provision to protect a pensioner's income from the claims of creditors. [Footnote omitted.]
 We have never thought that a spouse in a divorce proceeding had a status similar to that of a creditor. . . .
 We hold that 11 O.S. 1981, § 50-124 does not exclude Police Pension Benefits from being considered as jointly acquired property in a divorce proceeding. This statute protects a pensioner's benefits from the claims of third-party creditors and has no applicability to a divorce
Next, in Lindner v. Lindner, 358 N.W.2d 376, 377-78
(Mich.App. 1984), the court stated in part as follows:
 We recently held that all assets of the parties, whether owned jointly or separately, are considered marital assets for property settlement. . .
 The instant case presents the issue of how this general rule is to be applied to a teacher's pension plan, given the existence of M.C.L. § 38.1346 (1); M.S.A. § 15-893 (156)(1), which exempts such funds from "* * * execution, garnishment, attachment, the operation of bankruptcy or insolvency laws, or other process of law * * * . . .
 The purpose behind the rule exempting pensions from legal process is to protect the employee from claims of creditors. The marital relationship is not that of a debtor or creditor. Although a spouse is similar to a partner, the relationship is unique in the law and need not be analogized to any other type of legal entity. A spouse is a spouse. The law governing the creation and dissolution of a marriage is unique unto itself and a rule that applies to commercial transactions need not apply CT Page 11650 to a marriage where the public policy considerations relating to the protection of divorcing spouses, e.g., the desirability of adequate support and an equitable division of joint property, are entirely different. For this reason we must give a strict construction to the statute in question and hold that taking a pension into account in arriving at an equitable distribution in a divorce case is not a "process of law", which, when strictly construed, means a writ, mandate, attachment, execution or injunction. See Black's Law Dictionary (4th ed.), p. 1370.
Finally, in Prince George's County v. Burke, 584 A.2d 702,705-07 (Md. 1991), in which the court stated in part as follows:
 Citing Hoffman Chev. v. Wash. Co. Nat'l Sav., 297 Md. 691, 705-06, 467 A.2d 758, 766 (1983), the Trustees claim that, because the pension plan's terms impose a restraint on alienation of plan benefits, the plan constitutes a spendthrift trust under the common law of Maryland and, therefore, is protected from attachment or invasion by creditors of a beneficiary. The non-alienation terms of the Prince George's County Police Pension Plan state:
 "11.1 Any benefit which shall be payable under 1 the Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any such benefit shall be void . . . and any such benefit shall not in any manner be liable for or subject to the debts, contracts, liabilities, engagements or torts of the person who shall be entitled to such benefit, nor shall it be subject to attachment or legal process for or against such person."
 For the purpose of this opinion, we again will assume without deciding that the plan is a spendthrift trust and cannot be reached by creditors of a beneficiary. Any assumptions we make CT Page 11651 in favor of the Trustees become irrelevant, however, because we hold that the ex-spouses in the instant cases are not creditors. The Trustees also argue that both trial judges exceeded their authority 1) by transferring a partial ownership interest in the plan to a non-participant former spouse and 2) by ordering direct payments of benefits to a creditor. These contentions must fail because we do not deem the former spouses to be creditors.
* * *
 Whether the pension is a spendthrift trust is immaterial to the issue at hand. The husbands' pensions are not being used to discharge debts that they owed to their wives. Rather, the courts called for the equitable distribution of marital property and ordered that each spouse be paid his or her rightful portion as it becomes due. When a pensioner becomes eligible to collect, the spouse becomes eligible to collect his or her share as a co-owner, not as a creditor. [Footnote omitted.]
 Nothing in the Marital Property Act supports the assertion that a pensioner's ex-spouse should be categorized as a creditor. Rather, logic dictates that once the court, sanctioned by section 8-205, uses its power to transfer ownership rights in a pension or retirement plan, the ex-spouse becomes an owner of a portion of the plan. Appellant would have us rule that, with the issuance of the divorce decree and division of marital assets that include a pension, a wife is automatically transformed from a partner in marriage into a general unsecured creditor. Such a ruling would not only be contrary to reason, but would fly in the face of sound public policy. [Footnote omitted.] . . .
 We hold that the trial judges properly utilized their authority by transferring an interest to Mrs. Burke and Mrs. Harman, respectively, in each of their ex-husband's pension benefits. The Prince George's County Police Pension CT Page 11652 Plan may properly be ordered to tender direct payment to the former spouses of plan participants.
In Krafick v. Krafick, 234 Conn. 783, 794-97 (1995), the court addressed pension plans and stated in part as follows:
 Pension benefits represent a form of deferred compensation for services rendered. [Citations omitted; internal quotation marks omitted.] . . .
 Nothing in the legislative history of § 46b-81 indicates an intent to narrow the plain meaning of "property" from its ordinarily broad and comprehensive scope. Indeed, the term "property" has been broadly defined elsewhere in the General Statutes. See General Statutes § 52-278 (for purposes of attachment, property is defined as "any present or future interest in real or personal property, goods, chattels or choses in action, whether such is vested or contingent." (Emphasis added.)
 Interpreting the term property broadly is also consistent with the purpose of equitable distribution statutes generally. It is widely recognized that the primary aim of property distribution is to recognize that marriage is, among other things, "a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute — directly and indirectly, financially and nonfinancially — the fruits of which are distributable at divorce." (Emphasis added.) [Citations omitted.]
 Pension benefits are widely recognized as among the most valuable assets that parties have when a marriage ends. In re Marriage of Brown,
supra, 15 Cal.3d 846. . . . It would be unfair and contrary to the purpose of the statute to "strip the nonemployee spouse of the value of the retirement asset by precluding [the trial court] from evaluating its worth prior to adjudicating the property rights of the estranged marriage partners." Id. Thus, it would not make sense, where the legislature has acted to expand the range of CT Page 11653 resources subject to the trial court's power of division, to adopt a narrow construction of the operative term "property." [Citations omitted.]
This court holds that the language of § 14-60 does not prohibit the court in a dissolution action from transferring to a nonemployee spouse a portion of the pension rights that the employee spouse has under this plan. Consistent with the holding in Krafick, it would not make sense, where the legislature has acted to expand the range of resources subject to the trial court's power of division, to adopt a construction of § 14-60
of this pension plan so as to strip the nonemployee spouse of the value of this retirement asset. The purpose behind § 14-60 is to protect the employee from creditors of the employee. A spouse is not a creditor. Once the court exercises its power to transfer ownership rights in a pension or retirement plan, the ex-spouse, nonemployee becomes an owner of a portion of the plan, and not a creditor.
To the extent that the pension board claims that § 14-60
of the police pension fund states that the pension shall be unassignable, that provision exceeds the authority granted to the city of Danbury. The pension plan was adopted pursuant to Connecticut General Statutes § 7-450 and to collective bargaining agreements between the city of Danbury and the union representing the police officers of Danbury, and was created as a result of Connecticut Special Act (1949) January Session No. 512 — AN ACT AMENDING THE CHARTER OF THE CITY OF DANBURY CONCERNING THE PENSION FUND OF POLICE DEPARTMENT. Section 12 of the act provides in part that:
 The cash and securities held under the provisions of this act shall be exempt from any state or municipal tax and from levy, sale, garnishment, attachment or any other process, and shall be assignable.
To the extent that the pension fund provides that the benefits are unassignable in § 14-60, that provision exceeds the authority granted to the city of Danbury and is, therefore, invalid.
Further, § 52-321a does not prohibit the court from assigning this fund to a spouse. CT Page 11654
 Section 52-321a. Trust or retirement income unavailable to creditors. Exceptions provides in part as follows:
 (a)(3) any pension plan . . . established by federal or state statute for federal, state or municipal employees for the primary purpose for providing benefits upon retirement by reason of age, health or length of service, shall be exempt from the claims of all creditors of such participant or beneficiary. . . .
 (b) Nothing in this section shall impair the rights of an alternate payee under a qualified domestic relations order, as defined in Section 414 (p) of the Internal Revenue Code of 1986 . . .
The purpose of the exemption in § 52-321a, however, "was to prevent creditors other [than] a spouse seeking maintenance" from reaching the pension benefits. Casey v. Casey, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 465885 (November 13, 1995, Jackaway, J.). See generally 34 H.R. Proc., Pt. 11, 1991 Sess., pp. 34-36; 34 H.R. Proc., Pt. 13, 1991 Sess., pp. 21-22; 34 S. Proc., Pt. 7, 1991 Sess., p. 125; Joint Committee on Judiciary, Pt. 2, 1991 Sess., pp. 117-18. Furthermore, other statutory anti-assignment provisions have been interpreted to exempt domestic relations orders. For example, General Statutes § 5-171 of the State Employee's Retirement Act, contains an anti-assignment clause which the Connecticut Comptroller's Office has deemed to be inapplicable to orders for spousal or child support. McGran v.McGran, Superior Court, judicial district of New Haven at New Haven, Docket No. 354670 (December 8, 1995, Munro, J.). In addition, General Statutes § 52-350a et seq. exempts family support judgments from the ban on postjudgment attachment of retirement income. Iannotti v. Iannotti, Superior Court, judicial district of New Haven at New Haven, Docket No. 238433 (January 17, 1997, Alander, J.) (18 CONN. L. RPTR. 509).
The public policy of this state is to allow courts to reach an employee's pension benefits in a dissolution proceeding for the benefit of the nonemployee. Any attempt by § 14-60 of the police pension plan to preclude the court from reaching the employee's pension benefits would be contrary to public policy and unenforceable. CT Page 11655
This court is aware of the fact that the city of Danbury pension board and its individual members are not parties to this action. Nevertheless, upon receiving notice of the orders contained herein, the individual members of the pension board and the pension board itself come within the class of persons whose conduct is affected by the court order and are bound by the order. Clancy v. Clancy, 26 Conn. Sup. 46 (1965). The members of the police pension fund are as follows: Mayor Gene Eriquez, Donald Sutera, Ernest Boynton, Mitch Weston, Mark Rosato and Robert Williams.
The plaintiff owns a home located at 24 Mountain Road, Danbury, Connecticut. It was purchased by him on March 20, 1980, with his prior wife who has since died. The purchase price was $74,500. It was financed in part with a mortgage of $25,000. From the evidence presented, the court finds that the fair market value of that home is $150,000. There has been no credible evidence presented as to the value of the plaintiff's home or the amount of its mortgage as of the date the parties married.
This court has considered the provisions of § 46b-82
regarding the issue of alimony, and has considered the provisions of § 46b-81(c) regarding the issue of property division, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders.
ORDERS
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY
1. The plaintiff is ordered to pay to the defendant alimony in the sum of $125 per week.
2. Alimony shall terminate upon the earliest of the following events: (a) the death of the plaintiff; (b) the death of the defendant; (c) the date the plaintiff retires as a police officer with the city of Danbury and the defendant commences to receive the pension benefits hereinafter ordered. CT Page 11656
3. The plaintiff is to cooperate in order for the defendant to receive COBRA benefits. The cost for such benefits is to be paid by the defendant.
4. The plaintiff shall name the defendant as beneficiary on a life insurance policy insuring his life in an unencumbered amount of $50,000 so long as he is obligated to pay alimony. The plaintiff shall furnish the defendant, on her request, but no more than twice annually, on the first business day in January and on the first business day in July, proof that he is insured in the specified amount and that the beneficiary of said insurance is as required by this agreement. In the event that said insurance shall not be maintained in effect at the time of the plaintiff's death, and in the event the plaintiff has not made a bequest in his will to the defendant for $50,000, then the shortfall or the full amount of the $50,000, as the case may be, shall constitute a charge upon the plaintiff's estate and an indebtedness of the estate of the plaintiff in favor of the defendant to the extent of the provisions of this paragraph.
C. BY WAY OF PROPERTY ORDERS
1. The court orders that the defendant pay the following liabilities shown on her financial affidavit and hold the plaintiff harmless: (a) Dr. Ronald Giz — $11,330. The court orders the plaintiff to process the dental bill of Dr. Giz through his health insurance and that any amount received be paid over to Dr. Giz. The remaining balance is to be paid by the defendant and she is to hold the plaintiff harmless.
2. The court orders that the plaintiff hold the defendant harmless from the following liabilities shown on his financial affidavit: (a) Suncoast Schools Federal Credit Union — $51,000: and (b) automobile loan — $11,000.
3. The defendant's claim for relief includes a Schedule A listing certain items in the possession of the plaintiff that she is seeking. Item one on Schedule A is awarded to the plaintiff. Items two, three, four, five, six, seven, eight, nine and thirteen are awarded to the defendant. The defendant is awarded one of the two brass floor lamps to be chosen by her. The refrigerator in the garage is awarded to the defendant if it is a Sears Cold Spot refrigerator. Otherwise, it is awarded to the plaintiff. All remaining furniture and furnishings in the possession of the plaintiff are awarded to the plaintiff. CT Page 11657
4. All furniture and furnishings in the possession of the defendant are awarded to the defendant.
5. The real property in Delaware is ordered sold and the proceeds equally divided between the parties. Until closing, the parties shall be equally responsible for paying the taxes and insurance. The parties shall immediately execute a listing agreement listing the property for sale for $30,000. Each party shall assume their percentage share for reporting for capital gains purposes. The court retains jurisdiction of any disputes that may exist regarding the sale of the property.
6. The home at 24 Mountain Road, Danbury, Connecticut is awarded solely to the plaintiff. The 1996 Dodge shown on the plaintiff's financial affidavit is awarded solely to the plaintiff. All bank accounts, stocks, bonds and mutual funds shown on the plaintiff's financial affidavit are awarded solely to the plaintiff.
7. The plaintiff is to pay to the defendant $10,000 as a partial property distribution by December 8, 1997.
8. The mobile home, motor vehicle, bank accounts, and stocks shown on the defendant's financial affidavit are all awarded to the defendant, as is the cash surrender value of her life insurance policy.
9. The court awards to the defendant 20 percent of the pension benefits to which the plaintiff is entitled as of the date he retires. The court is aware of the fact that this division is not to be through a QDRO as this pension is not covered by ERISA. An equivalent domestic relations order is to be prepared by counsel for the defendant. It is to include an order to the pension board and to each individual member of the following: (a) the pension board is to either approve of the domestic relations order at its next regularly scheduled meeting following the date that a copy of the domestic relations order has been served on each individual member of the pension board. In the event the pension board finds that the language of the domestic relations order is not acceptable, then it is to notify counsel for the defendant, in writing, within ten days of such regularly scheduled meeting of the exact language that is not acceptable and the exact language that will be acceptable. The pension board is ordered not to make any payments to the CT Page 11658 plaintiff that he may otherwise be entitled to receive under the pension plan unless simultaneously with such payments the pension board pays directly to the defendant 20 percent of the share that the plaintiff would have been entitled to receive. Other than for language changes that may be requested by the pension board and approved by this court, the pension board is ordered to adopt a resolution approving of the domestic relations order submitted to it and agreeing to comply with the document including paying directly to the defendant 20 percent of the total share of the pension benefits to which the plaintiff is otherwise entitled to receive. (b) The cost of serving upon each member of the pension board the domestic relations order that is prepared by counsel for the plaintiff is to be shared equally between the plaintiff and the defendant. (c) In the event the language of the domestic relations order is changed, then the pension board is to approve of the changed language of the domestic relations order at the first meeting following which it has received the revised domestic relations order. The revised domestic relations order is to be served on each member of the pension board by a sheriff with the plaintiff and the defendant equally sharing in such costs. (d) All such service may either be by personal service or abode service. It is the intent of this order that the benefits granted to the defendant in the plaintiff's pension plan be a qualified domestic relations order as defined in § 414 (p) of the Internal Revenue Code of 1986. In the event the plaintiff receives from the pension board the 20 percent which has been awarded to the defendant, then, in such an event, the plaintiff is ordered to immediately turn such 20 percent over to the defendant. The court retains jurisdiction over any disputes that may exist regarding this order, including the right to include additional members of the pension board, by name, to be notified of this domestic relations order.
10. All of the defendant's social security benefits are awarded solely to the defendant.
D. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either party.
E. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and filing. CT Page 11659
2. The parties are to exchange copies of their federal and state income tax returns by certified mail, return receipt or registered mail, return receipt within thirty days after such returns have been filed for so long as there is an outstanding alimony order or any outstanding arrearage from such order.
Axelrod, J.